# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-048**

**Filing Date: March 17, 2021**

**No. A-1-CA-37899**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**JUSTIN HANSEN,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cindy Leos, District Judge**

Certiorari Denied, August 27, 2021, No. S-1-SC-38778.  Released for Publication October 12, 2021.

Hector H. Balderas, Attorney General
Emily C. Tyson-Jorgenson, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Luz C. Valverde, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## OPINION

**IVES, Judge.**

**{1}**    Defendant Justin Hansen pleaded no contest to two second-degree felonies, attempted first-degree murder contrary to NMSA 1978, Sections 30-28-1(A) (1963) and 30-2-1(A)(2) (1994) and aggravated burglary with a deadly weapon contrary to NMSA 1978, Section 30-16-4(A) (1963). On appeal, Defendant argues that his convictions are barred by the statute of limitations and that, if his convictions stand, he should receive presentence confinement credit for time spent on house arrest. We affirm Defendant's

convictions because he waived his statute of limitations defense by entering a no contest plea. We reverse Defendant's sentence because the district court erroneously denied him credit. We discuss Defendant's arguments pertaining to his convictions and sentence in turn, first describing the pertinent background and then explaining our analysis.

## I.      Defendant Waived His Statute of Limitations Defense

## A.      Background

**{2}**      The event underlying this case is a horrific attack inflicted on Victim, a high school student at the time, with a shovel at her family's home in the fall of 2008. The police recovered DNA evidence from the scene of the crime. On December 28, 2010, the State filed a "John Doe" grand jury indictment describing the perpetrator's DNA profile and physical appearance. After the State obtained a sample of Defendant's DNA, which testing demonstrated matched the perpetrator's DNA profile described in the indictment, Defendant was arrested on July 6, 2017. The State subsequently filed an amended indictment naming Defendant and charging him with six crimes: kidnapping (physical injury) contrary to NMSA 1978, Section 30-4-1(A)(4) (2003), a first-degree felony; attempted first-degree murder contrary to Sections 30-28-1(A) and 30-2-1(A), a second-degree felony; aggravated burglary (deadly weapon) or, in the alternative, aggravated burglary (battery) contrary to Section 30-16-4, both second-degree felonies; aggravated battery with a deadly weapon or, alternatively, resulting in great bodily harm contrary to NMSA 1978, Section 30-3-5(A), (C) (1969), both third-degree felonies; aggravated assault (deadly weapon)[1] contrary to NMSA 1978, Section 30-3-2(A) (1963), a fourth-degree felony; and child abuse contrary to NMSA 1978, Section 30-6-1(D)(1) (2005, amended 2009) or, alternatively, Section 30-6-1(D)(2), both first-degree felonies under Section 30-6-1(E).

**{3}**      Defendant moved to dismiss all counts charging him with second-, third-, or fourth-degree felonies, asserting that the statute of limitations had run on those counts before the State filed an indictment that named him as the defendant. *See generally* NMSA 1978, § 30-1-8(A), (B) (2005, amended 2009) (providing that "[n]o person shall be prosecuted, tried or punished in any court of this state unless the indictment is found or information or complaint is filed" within five years for third- or fourth-degree felonies and six years for second-degree felonies). The parties argued the motion in a hearing at which Defendant was present. The district court denied the motion but granted leave to file an application for interlocutory appeal, and Defendant petitioned this Court for interlocutory review or a writ of error. This Court declined to review the district court's order.

**{4}**      Defendant and the State then entered an unconditional plea agreement in which Defendant agreed to plead no contest to the attempted first-degree murder and aggravated burglary with a deadly weapon charges, and the State agreed to dismiss all other charges. Defendant also agreed to "give[] up all motions, defenses, objections, or

---

[1]The charge of aggravated assault related to a crime committed against Victim's mother.

requests [that he] ha[d] made or could make concerning the [district c]ourt's entry of judgment . . . if that judgment [was] consistent with [the] agreement." The district court approved the agreement and entered a judgment and sentence finding Defendant guilty of the two offenses to which he pleaded no contest.

## B.     Discussion

**{5}**     A valid guilty or no contest plea "ordinarily constitutes a waiver of the defendant's right to appeal [a] conviction on other than jurisdictional grounds." *State v. Hodge*, 1994-NMSC-087, ¶ 14, 118 N.M. 410, 882 P.2d 1. Before a trial court may accept and enter judgment on a defendant's plea, however, the court must, as a matter of federal constitutional law, ensure that the plea is entered knowingly and voluntarily and that this is affirmatively shown by the record. *See State v. Garcia*, 1996-NMSC-013, ¶ 9, 121 N.M. 544, 915 P.2d 300. Adopting the "waiver approach" to statutes of limitations in *State v. Kerby*, 2007-NMSC-014, 141 N.M. 413, 156 P.3d 704, our Supreme Court held that criminal defendants may waive a statute of limitations defense but, as a matter of state law, may do so only if the defendant's relinquishment of the defense comports with similar requirements: "[T]he statute of limitations is a substantive right that may only be waived by a defendant after consultation with counsel, and only if the waiver is knowing, intelligent, and voluntary." *Id.* ¶ 18; *see also State v. Pearson*, 858 S.W.2d 879, 887 (Tenn. 1993) ("[A] waiver of the statute of limitations will not be presumed where there is no evidence in the record to indicate that the defendant was made aware of the issue."), *cited approvingly by Kerby*, 2007-NMSC-014, ¶ 17. Thus, the question here is whether the record affirmatively shows that Defendant knowingly and voluntarily waived the statute of limitations by entering his no contest pleas. We hold that it does.

**{6}**     Defendant's challenge to the validity of his waiver is narrow. Defendant does not contend that he was unaware of the statute of limitations governing the two second-degree felonies to which he pleaded no contest or the legal effect of the statute on the State's ability to prosecute him for those offenses if the statute applied. Nor does Defendant assert that he did not understand the statute of limitations to be one of the "defenses" he expressly gave up in pleading no contest. The absence of such arguments is understandable; after all, Defendant litigated the statute's applicability below, attended a hearing on the issue, and unsuccessfully sought interlocutory review of the district court's adverse ruling in this Court.

**{7}**     Consequently, the sole basis for Defendant's claim that he did not knowingly, intelligently, and voluntarily waive the statute of limitations is the novel argument that he *could* not do so because New Mexico's appellate courts have yet to address whether a "John Doe" DNA indictment qualifies as an "indictment" within the meaning of New Mexico's general criminal statute of limitations, Section 30-1-8. It is tempting to dismiss this argument out of hand. *Cf. Halsey v. Clarke*, 821 F. Supp. 1319, 1321 (D. Neb. 1993) ("All decisions to waive a jury trial are based upon some uncertainties of what the evidence will be at a future trial. A defendant simply cannot insist that unless he knows what evidence will be received there can be no voluntary waiver."), *aff'd on other grounds*, 5 F.3d 531 (8th Cir. 1993). But because of the importance of the substantive

right involved and the dearth of New Mexico case law addressing waiver of the statute of limitations, we provide a more fulsome explanation of why Defendant's argument fails.

**{8}** In adopting the waiver approach, our Supreme Court struck a balance between the critical policies advanced by the statute of limitations and a recognition that the jurisdictional approach—an unyielding enforcement of the limitations time bar—may work to the detriment of the accused. *See Kerby*, 2007-NMSC-014, ¶ 15 (discussing the "jurisdictional approach," under which the statute of limitations "is a jurisdictional limit on the subject matter [jurisdiction] of a court that cannot be waived or forfeited"); *id.* (noting that one reason for shifts toward a waiver approach in other jurisdictions "appears to be [that] the primary policy of a criminal statute of limitations, to protect the defendant, is not served by strict adherence to a jurisdictional approach"); *cf. Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942) ("What were contrived as protections for the accused should not be turned into fetters."). The waiver approach guarantees that all defendants have an opportunity to raise a statute of limitations defense if they wish to do so. Because the approach requires the statute to be knowingly, intelligently, and voluntarily waived, it operates as an absolute shield against the loss of that defense through inadvertence. *See Kerby*, 2007-NMSC-014, ¶ 19 ("[T]he protection of the statute of limitations is too important to be unintentionally lost." (internal quotation marks and citation omitted)). To further safeguard against unknowing loss of the statute's protection, our Supreme Court held in *Kerby* that waivers are valid only if they are made after consultation with counsel. *Id.* ¶ 18.

**{9}** At the same time, the *Kerby* Court recognized that the ability to waive objection to an untimely prosecution may enable a defendant to achieve an outcome more favorable, from the defendant's perspective, than that which could be obtained if the statute's bar was applied. *See id.* ¶ 15 ("[C]ourts have moved away from the jurisdictional view and toward deciding that a defendant may waive the defense if it is beneficial to him or her."). For example, a defendant who is fearful that a jury will convict may hope to avoid the harsher penalties associated with conviction on a greater offense that is not time barred by giving the jury the option of finding guilt on a lesser offense that is time barred. *See generally People v. Lohnes*, 351 N.Y.S.2d 279, 282 (Sup. Ct. 1973) ("Criminal defendants . . . would suffer marked injustice from being denied this option. It would have the practical effect . . . of forcing convictions in a higher degree where guilt [of an offense] is plain, but where . . . a jury might convict for the lesser included degree of a given crime.").[2] In truly unusual cases, perhaps, a defendant might

---

2Our courts have yet to decide whether a defendant's request for a lesser included offense instruction is equivalent to the knowing, intelligent, and voluntary waiver required under New Mexico's waiver doctrine. *Compare Tucker v. State*, 459 So. 2d 306, 309 (Fla. 1984) ("[T]he mere request for instructions on time-barred lesser-included offenses is not an effective waiver. . . . The statute of limitations defense is an absolute protection against prosecution or conviction. Before allowing a defendant to divest himself of this protection, the court must be satisfied that the defendant himself, personally and not merely through his attorney, appreciates the nature of the right he is renouncing and is aware of the potential consequences of his decision."), *with State v. Leisure*, 796 S.W.2d 875, 879 (Mo. 1990) (en banc) ("[I]t would be jarringly inconsistent to allow [a] defendant the option of gambling on the jury's sense of mitigation or mercy by submitting a [lesser included offense] instruction . . . and then having received such merciful

decide to forgive the state's failure to timely prosecute in order to "vindicate [the defendant's] good name" in a trial on the merits. *Padie v. State*, 594 P.2d 50, 56 n.16 (Alaska 1979), *cited by Pearson*, 858 S.W.2d at 887 n.8, *cited in turn by Kerby*, 2007-NMSC-014, ¶ 17. Finally, if the state provides the option, a defendant may avoid prosecution for an offense or offenses on which the statute of limitations has not run by pleading guilty or no contest to a different, time-barred offense. In recognition of these and other potential benefits, our Supreme Court rejected the jurisdictional approach under which a defendant cannot waive the statute of limitations under any circumstance.

{10}    Yet, in none of those situations is a defendant guaranteed that the decision to waive will be a good one. A defendant who is convicted of a lesser offense after requesting that the jury be instructed on it might learn in postverdict discussions with jurors that the jury would have voted to acquit if convicting on the greater offense was its only alternative. A defendant determined to demonstrate his or her innocence in open court will be bitterly disappointed if the jury returns a guilty verdict. And a defendant who believes after consultation with competent counsel that the state will be able to prove charges that are not time barred may well regret the decision to waive the statute of limitations and plead guilty or no contest to different offenses if another attorney later advises the defendant that the prosecution's case was deficient, or if the defendant receives a harsher sentence than anticipated.

{11}    At its core, Defendant's argument amounts to nothing more than a complaint that greater clarity as to whether the statute of limitations barred prosecution would have affected his decision to waive the statute by entering a no contest plea. But although the perceived strength or weakness of a statute of limitations defense may be a factor in a defendant's decision to waive or stand on that defense, it does not follow that the defense can be knowingly, intelligently, and voluntarily waived only if its merits are clear. In the first place, a defendant never has absolute assurance that a statute of limitations defense will be successful until the last tribunal that addresses the issue has weighed in. *See McMann v. Richardson*, 397 U.S. 759, 771 (1970) ("[U]ncertainty is inherent in predicting court decisions[.]"); *id.* at 782 n.5 (Brennan, J., dissenting) ("[T]he risk of error or adverse result is inherent in every criminal proceeding[.]"); *cf. Demers v. Gerety*, 1978-NMCA-019, ¶ 2, 92 N.M. 749, 595 P.2d 387 ("Litigation is a slippery experience when appeals are reversed. Everything is uncertain until the case is put to rest."), *rev'd on other grounds*, 1978-NMSC-097, 92 N.M. 396, 589 P.2d 180. Preventing waiver of the statute until a defendant has a conclusive determination on the merits would place a straitjacket on the waiver doctrine to the detriment of defendants who fear they will end up with an adverse determination on the issue. The state could hardly be blamed for refusing to engage in a plea negotiation in which a plea to a possibly time-barred offense was used as a bargaining chip if there is a risk that a defendant's unconditional plea will be transformed into a conditional one after the fact. *See generally Hodge*, 1994-NMSC-087, ¶ 1 ("A conditional plea agreement is an agreement between the prosecutor and the defendant in a criminal case, under which,

---

consideration at the hands of his peers, reverse his field, assert the bar and ask the [c]ourt on appeal to free him from all accountability."). And we do not resolve this issue today.

subject to the trial court's approval, the defendant agrees to plead guilty [or no contest] to the offense charged but reserves one or more specific issues for appellate review following conviction."). Similarly, trial courts would be forced to reject a defendant's expressed willingness to forego a limitations defense in order to have a jury instructed on a possibly time-barred lesser included offense, leaving the defendant subject to the jury's choice between the two extremes of conviction on the greater offense and acquittal. This cramped interpretation of the waiver doctrine cannot be squared with the reasons given for its adoption by our Supreme Court in *Kerby*. *See* 2007-NMSC-014, ¶ 15.

{12}   Moreover, Defendant's argument necessarily rests on the premise that he would not have pleaded no contest if the statute of limitations applied. As the waiver examples discussed above demonstrate, however, the possibility that a defendant, with the benefit of hindsight, would have chosen not to waive the statute of limitations is no basis for concluding that a waiver is invalid. Whether a waiver is knowing, intelligent, and voluntary depends on the defendant's awareness of the right that is being waived—the right not to be prosecuted or convicted for time-barred offenses—and the potential costs and benefits of making the choice to waive; the retrospective advisability of the defendant's decision is irrelevant. Given the critical and absolute protection afforded defendants by the statute of limitations, the possibility that a defendant will live to regret waiving the statute inheres in the very concept of a waiver.

{13}   In entering his plea, Defendant avoided the risks of trial and an appeal with an uncertain outcome on the charges that the State dismissed pursuant to the plea agreement. That he did not know whether he stood to gain by taking this course is immaterial; it is enough that Defendant was, as he does not dispute, advised of the statute of limitations, the factual and legal basis for asserting it, and the range of outcomes that could result from its assertion or waiver. Nothing in *Kerby* suggests that the validity of a waiver turns on whether an accused had clarity about the merits of a statute of limitations defense at the time the defendant made the decision to waive. We decline to transform Defendant's unconditional plea into a conditional one after the fact. *Cf. People v. Hester*, 992 P.2d 569, 572 (Cal. 2000) ("[D]efendants who have received the benefit of their bargain should not be allowed to trifle with the courts by attempting to better the bargain through the appellate process."). We hold that Defendant waived the statute of limitations, and therefore affirm his convictions for attempted first-degree murder and aggravated burglary with a deadly weapon.

## II.   The District Court Erroneously Denied Defendant Presentence Confinement Credit

## A.   Background

{14}   Following Defendant's arrest, the district court ordered Defendant released from jail into the "[t]hird-party custody" of "persons to be approved by pretrial services" on July 13, 2017. Under his conditions of release, Defendant was required to "[b]e on [p]retrial [s]ervice supervision and abide by all conditions set by the [c]ourt and by

[p]retrial [s]ervices." He could not "leave [his] residence . . . without prior permission of" pretrial services and was required to submit to GPS monitoring to ensure compliance. The district court later amended Defendant's conditions of release to provide that Defendant could leave his house to pick up his children from school if accompanied by a preapproved third party.

{15}    On June 2, 2018, Defendant was seen at a professional baseball game in Albuquerque. Defendant had received permission from pretrial services to attend this game, and it was undisputed that Defendant therefore did not violate his conditions of release in doing so. The State nevertheless sought to have the district court "clarify" its prior orders because it "believe[d] that allowing such a frivolous outing [was] contrary to the spirit of the [orders] setting conditions of release[,] even if technically within the letter of [those] orders." In the State's view, Defendant should have been permitted to leave his house only for activities "reasonably necessary to [the] life, health, employment[,] or schooling" of Defendant or his family.

{16}    The district court held a hearing on the State's motion on June 13, 2018. At the hearing, the prosecutor argued that the judge who had imposed the original conditions of release had "set very strict conditions . . . and . . . authorized every condition at the highest levels of supervision to be placed on [Defendant,]" noting that the standard order imposing conditions, which would have prohibited Defendant from leaving his home during specified hours, had been modified to provide that Defendant could not leave his home without permission. *See generally* Rule 9-303 NMRA (form order setting conditions of release). Although he acknowledged that the order granted pretrial services the discretion to make exceptions to this otherwise strict house arrest, the prosecutor argued that the court's intent had been to allow only "very necessary exceptions," listing emergencies, doctor's appointments, and court appearances as examples. On the basis of Defendant's outing to the baseball game and an assertion, unsupported by evidence, that Defendant had been permitted to leave his home in order to go to restaurants, the prosecutor urged the district court to enter an order to ensure that any future departures from Defendant's residence would be strictly limited. In response, defense counsel asked the district court to leave the existing conditions of release in place, noting that Defendant had complied with the terms of the court's order and arguing that the baseball game could have been part of a "carrot and . . . stick" approach to pretrial supervision because "being given a little bit of lenienc[y] . . . [could] actually . . . make[] people more compliant with their supervision."

{17}    The court then heard from a representative of pretrial services, who acknowledged that he had allowed the visit to the baseball game and asserted that "nothing . . . would allow [pretrial services] to disallow the movement." At that point, the presiding judge noted that a different judge had entered the original order of release and that, other than the amendment explicitly permitting Defendant to take his children to and from school, the court had not altered, or intended to alter, the original order setting conditions of release. The court indicated that it would obtain a record of the pretrial detention hearing to clarify the original written order. It ultimately entered an order keeping the prior conditions in place and specifically providing that pretrial services

"continue[d] to have the discretion to determine if and when Defendant [could] leave his home."

**{18}** After Defendant entered his plea, defense counsel argued in an unfiled sentencing memorandum that Defendant was entitled to presentence confinement credit of 385 days: fourteen days in jail plus 371 days on pretrial release. In response, the prosecutor contended that Defendant was entitled to credit only for the time spent in jail because his liberty had not been sufficiently limited while under conditions of release. The district court imposed a sentence awarding Defendant fourteen days of credit and denied Defendant's motion to reconsider.

## B.    Discussion

**{19}** The statute governing whether Defendant is entitled to credit for the time he spent subject to conditions of release is NMSA 1978, Section 31-20-12 (1967), which provides that "[a] person held in official confinement on suspicion or charges of the commission of a felony shall, upon conviction of that or a lesser included offense, be given credit for the period spent in presentence confinement against any sentence finally imposed for that offense." Because the answer to the question presented hinges on the meaning of Section 31-20-12, our review is de novo. *State v. Romero*, 2002-NMCA-106, ¶ 6, 132 N.M. 745, 55 P.3d 441.

**{20}** Under the test announced by this Court in *Fellhauer*, a defendant awaiting trial or sentencing outside of the confines of a jail, prison, or other correctional facility is in "official confinement" within the meaning of Section 31-20-12 when two conditions are met:

> (1) a court has entered an order releasing the defendant from a facility but has imposed limitations on the defendant's freedom of movement, OR the defendant is in the actual or constructive[3] custody of state or local law enforcement or correctional officers; and (2) the defendant is punishable for a crime of escape if there is an unauthorized departure from the place of confinement or other non-compliance with the court's order.

1997-NMCA-064, ¶ 17, 123 N.M. 476, 943 P.2d 123.[4] The parties disagree about whether Defendant qualifies for credit under this standard, with both directing

---

3*See generally State v. Guillen*, 2001-NMCA-079, ¶ 8, 130 N.M. 803, 32 P.3d 812 ("We understand constructive custody to apply to situations in which a defendant is temporarily outside a penal institution, but is expected to return to the place of confinement.").

4We "[d]istill[ed]," *id.* ¶ 17, this test from six considerations: (1) the involuntariness of a defendant's confinement when the defendant is chargeable with escape for an unauthorized absence, "[o]ne of the distinguishing factors" under the approach taken by the minority of courts that had concluded that time in home confinement could qualify for credit, *id.* ¶ 13; (2) the expected impact of the identity of the custodian on a defendant's freedom, *see id.* ¶ 15; (3) the desirability of "simplify[ing] the sentencing court's inquiry to the extent possible[,]" *id.* ¶ 16; (4) precedent permitting credit for time other than "actual jail time," *id.* ¶ 7; (5) indications in other provisions of the Criminal Code that "confinement" could "to some degree [be]

arguments at each prong. Because we conclude that Defendant's conditions of release satisfy both prongs of *Fellhauer*, we hold that he is entitled to credit, reverse the district court's contrary ruling and reverse Defendant's sentence, and remand for sentencing in accordance with this opinion.

## 1. Defendant Was Subject to Limitations on Movement Within the Meaning of the First *Fellhauer* Prong

**{21}** In the years since *Fellhauer* was decided, "a substantial body of precedent" has developed in which this Court has applied the principles recognized in that case to cases involving presentence confinement credit and other related issues. *State v. Woods*, 2010-NMCA-017, ¶ 23, 148 N.M. 89, 230 P.3d 836. As to the first *Fellhauer* prong, it is now settled that "conditions of house arrest that require the defendant to remain at home except to attend specified events such as treatment, work, or school" constitute limitations on the defendant's freedom of movement. *Guillen*, 2001-NMCA-079, ¶ 11. And it is also settled that a defendant is not subjected to limitations on the defendant's freedom of movement where the defendant is placed on a "conventional curfew" that leaves the defendant "answerable to no one for his [or her] whereabouts" during non-curfew hours. *State v. Figueroa*, 2020-NMCA-007, ¶¶ 31, 33, 457 P.3d 983. The issue presented by this case, however, is an open one. We must decide whether Defendant's freedom of movement was restricted by the condition that he remain in his home unless given permission to leave by pretrial services. We hold that it was.[5]

**{22}** We conclude that the condition requiring Defendant to obtain permission from pretrial services prior to leaving his home should be treated no differently than a court order directing Defendant to remain at his home at all times with exceptions for "specified events such as treatment, work, or school." *Guillen*, 2001-NMCA-079, ¶ 11. At no point while he was released pending trial or sentencing did Defendant have the freedom to choose his own whereabouts. Although he could express his desire to leave for a particular purpose, a governmental entity had the authority to decide whether he could leave. Defendant would have been in breach of his conditions of release if, for instance, he had been refused permission to attend the baseball game and nonetheless done so. Under our holding in *Guillen*, Defendant would have been entitled to credit had his conditions of release required him to stay at home at all times or permitted him to leave his home only to take his children to and from school. And the same would necessarily be true if, under the release orders actually entered here, pretrial services had exercised its discretion to prohibit Defendant from leaving his home at all, or to permit him to leave for similar specified events. Since pretrial services, in deciding

---

constructive rather than actual," *id.* ¶ 16; and (6) a willingness to permit sentencing courts to exercise "reasonable flexibility," *id.* ¶ 16.

5Defendant asserts, and the State does not dispute, that Defendant's conditions of release required him to be accompanied by a third person at all times, even while he was within his residence. Because we base our holding on the discretion granted pretrial services to decide whether and for what purposes Defendant could leave his residence, we do not address this condition of Defendant's release. *But cf. State v. Frost*, 2003-NMCA-002, ¶¶ 1, 3, 133 N.M. 45, 60 P.3d 492 (holding that the defendant could serve a mandatory jail sentence in an electronic monitoring program that required him to "reside with his daughter . . . and be supervised by either of his two daughters at all times").

whether Defendant could leave his home, was exercising discretion granted it by the court, it would make little sense to deny credit on the basis of nice distinctions between the types of decision makers directly responsible for restricting Defendant's freedom of movement.

**{23}** That pretrial services took what we think was an unduly narrow view of the discretion granted it under the district court's pretrial release orders[6] does not affect our conclusion. We acknowledge that attending a baseball game is an activity different in kind from "treatment, work, or school." *Guillen*, 2001-NMCA-079, ¶ 11. However, we are unable to extract from that difference any general principle that courts could apply evenhandedly to the myriad purposes and lengths of time for which a defendant might be permitted to leave home. And we see no compelling policy reason to deny Defendant credit on the basis of an outing that, as defense counsel below recognized, could have been a rational exercise of pretrial services' discretion intended to encourage continuing compliance with Defendant's conditions of release. *Cf. State v. Duhon*, 2005-NMCA-120, ¶ 12, 138 N.M. 466, 122 P.3d 50 (recognizing "[t]he societal interest in obtaining criminal defendants' compliance with custodial restrictions").

**{24}** Facially similar conditions of pretrial release are not always equal in practical effect. The defendant who resides with extended family on a large ranch property near Roswell is thought to be on house arrest no less than the defendant who lives alone in a one-bedroom efficiency apartment in downtown Albuquerque. The defendant on house arrest whose occupation requires the defendant to travel throughout a locality is no less entitled to credit than the defendant who works at a specific job site: both may leave home only to "attend . . . work." *Guillen*, 2001-NMCA-079, ¶ 11. Since it is well established under our case law that "confinement [in]side the four walls" of an institution is not required for a defendant to qualify for credit, *Fellhauer*, 1997-NMCA-064, ¶ 6, difficult line-drawing is inevitable. *Cf. Reno v. Koray*, 515 U.S. 50, 64 (1995) (acknowledging that the federal approach "treat[s] defendants differently . . . when they are similarly situated in fact[,]" but suggesting that the alternative framework considered by the Court would result in "much the same kind of disparity in treatment for similarly situated defendants"). On balance, we deem it manifestly fairer to award credit to some defendants who, despite needing judicial or other governmental approval, are in fact permitted a wide range of movement while on pretrial release than to deny credit to some defendants on the basis of after-the-fact evaluations of whether a particular departure from the place to which a defendant is otherwise confined is deserving of credit.

**{25}** The dissent asserts that we should affirm on the basis of the facts the dissent concludes were found by the district court, observing that, under our reasoning in *Fellhauer*, 1997-NMCA-064, ¶ 16, "fact-finding by sentencing courts may be required in

---

6The orders required Defendant to request "permission" before leaving his residence, gave pretrial services "discretion to determine if and when" Defendant could do so, and required Defendant to abide by "conditions" set by pretrial services. We do not see how these orders can reasonably be interpreted to grant Defendant carte blanche to roam forth at will upon giving pretrial services advance notice of his intended whereabouts.

determining whether a defendant's conditions of release are sufficiently onerous such that the defendant is entitled to credit." Dissenting Op. ¶ 39. Truth be told, our prior presentence confinement credit decisions point in different directions when it comes to the desirability of fact-finding in this context. *See, e.g., Guillen*, 2001-NMCA-079, ¶ 6 ("In *Fellhauer*, we noted that our analysis of the law of presentence confinement credit is guided by a desire to simplify the sentencing court's inquiry to the extent possible by providing a clear guide that does not require fact intensive inquiries into whether specific conditions of release subject a defendant to jail-type confinement." (internal quotation marks and citation omitted)). And the dissent's approach raises more questions than it answers by urging reliance on fact-finding without providing any standard for sentencing courts to apply in evaluating conditions of release that require a defendant to remain at home unless given permission to leave.[7] The dissenting opinion leaves unclear, for example, whether the reason a defendant leaves the defendant's home should be determinative. If it should, the dissenting opinion never explains what purposes should be disqualifying, the frequency with which a defendant must engage in undeserving approved activities before losing credit entirely, or whether district courts must conduct a day-by-day examination—of time periods that can exceed 600 days, *see, e.g., Duhon*, 2005-NMCA-120, ¶ 5—to decide which days qualify. If, on the other hand, the purposes of particular outings are not to be controlling, then the dissent never explains what circumstance or combination of circumstances should be.[8]

**{26}** Moreover, any test along those lines—a fact-intensive evaluation of the judicially-delegated discretion exercised by a pretrial services office—would result in case-specific line-drawing incapable of principled implementation. The more lines get drawn, the more they will become blurry or so fine as to be arbitrary, and the more difficult it will become for sentencing courts throughout our state and our appellate courts to evenhandedly and uniformly apply our "mandatory" presentence confinement credit statute. *See State v. Ramzy*, 1982-NMCA-113, ¶ 8, 98 N.M. 436, 649 P.2d 504; *cf. State v. Byam*, 2017 VT 47, ¶ 14, 205 Vt. 173, 172 A.3d 171 ("In the context of sentencing, vague rules lead to unjust outcomes."). Our approach has the advantage of providing litigants and courts with a clear rule, one that avoids the multiplicity of arbitrary distinctions we think would inevitably follow were we to side with the dissent.

**{27}** Our more fundamental disagreement with the dissent, however, pertains to its characterization of the burdens imposed by the conditions of release at issue here. The dissent's analysis mistakes the "freedom" of being confined at home unless given permission to leave for purposes approved by pretrial services for the freedom to

---

7The dissent does not contend that Defendant would fail to meet the first *Fellhauer* prong if pretrial services had, in fact, forbidden Defendant from leaving his home completely, or exercised its discretion to confine Defendant to certain kinds of activities.

8The dissent emphasizes a statement indicating that the pretrial services office overseeing Defendant's release did not "have the staff capable to follow every person ordered to do electronic monitoring" and infers that this means "pretrial services was [not] tracking all of Defendant's movements." Dissenting Op. ¶ 40. But that statement indicates only that Defendant's movements were not constantly monitored by another person without saying anything about whether Defendant's movements were electronically recorded, as common sense suggests they were. And the dissent does not say what role the presence or absence of constant monitoring or supervision should play in our analysis.

choose one's whereabouts. *See* Dissenting Op. ¶¶ 40, 42. On their face, the district court's orders granted pretrial services the authority to give or withhold its permission for any outing Defendant might take. To avoid running afoul of the limits the district court had placed on his freedom of movement, Defendant was required to ask whether he could leave his home and, the record shows, obtain approval of the purpose for which he could do so. Absent approval to be elsewhere, Defendant had to stay in his residence, and he would surely have been unsuccessful had he argued in a hypothetical revocation hearing that he could comply with the orders setting conditions of release by leaving his residence over the objections of pretrial services. Notwithstanding the dissent's charge that we are "inappropriately elevat[ing] the text of the written order over Defendant's actual conditions of release[,]" Dissenting Op. ¶ 39, we think that text and the actual conditions of Defendant's release are inextricably intertwined. The district court's orders gave pretrial services discretion to deny Defendant's requests to leave regardless of what a particular employee of pretrial services believed.

### 2. Defendant Satisfies the Second Prong of *Fellhauer* Because He Could Have Been Charged With Escape From a Community Custody Release Program

**{28}** After adopting the standard—unchallenged by either party here—for determining whether a defendant qualifies for credit, we held in *Fellhauer* that the conditions on which the defendant in that case had been released did not meet its second prong. 1997-NMCA-064, ¶ 19. The defendant had been released to the custody of a relative on conditions that required him to be on house arrest and only leave for medical treatment or to visit with his attorney. *Id.* ¶ 2. However, any "non-compliance with house arrest would only have resulted in a revocation of [the] order of release." *Id.* ¶ 19. And, although the defendant would have been criminally liable for failing to appear when the district court required his presence, we found "[t]his potential legal hazard [to be] different from an escape charge[, ]which require[d] custody of some kind[.]" *Id.* ¶ 20. We accordingly held that the defendant was not entitled to presentence confinement credit because, as relevant, he could not have been convicted of any escape offense for conduct engaged in during his time on pretrial release. *Id.* ¶ 19.

**{29}** This Court reaffirmed what it termed an assumption in *Fellhauer*—that "failure to abide by the terms of a house arrest would not constitute the crime of escape"—in *State v. Martinez*, 1998-NMCA-047, ¶ 5, 125 N.M. 83, 957 P.2d 68. The defendant in *Martinez* had been released from jail to complete her sentence in her home in an electronic monitoring program, apparently administered by the jail. *Id.* ¶ 2. She was charged with escaping from jail in violation of NMSA 1978, Section 30-22-8 (1963) after failing to return home following an appointment and not reporting to the program thereafter. *Martinez*, 1998-NMCA-047, ¶ 2. In a series of earlier cases, this Court had held that a person in jail could contravene Section 30-22-8 "without breaking out from the confines of the jail itself." *Martinez*, 1998-NMCA-047, ¶ 4. In each of those cases, however, the defendant had "failed to return to jail when [the defendant] was required to be there"; "the dispositive issue" had been whether the defendant was "lawfully committed to jail and thereafter failed to return to jail, even though [the defendant] was given permission to be outside its confines for a specific period of time." *Id.* (internal

quotation marks and citation omitted). The *Martinez* defendant, in contrast, "was under no obligation to report to jail at any future time." *Id.* ¶ 5. Unable to understand how "one can *escape* from jail when one is never obliged to *be* in jail[,]" the Court applied the principle that a criminal statute should be interpreted in accordance with its plain meaning, *id.* ¶ 5, and held that the defendant could not be charged with escape. *Id.* ¶¶ 9, 11. Although the Court felt this was an "undesirable result," *id.* ¶ 9, in light of the criminal penalties imposed on defendants who fail to return after receiving "permission to be outside [a jail's] confines for a specific period of time[,]" *id.* ¶ 4 (internal quotation marks and citation omitted), the Court believed that it was compelled by "a gap in a 1963 statute that did not contemplate home detention." *Id.* ¶ 9. And this Court could not remedy this gap; "[t]hat task rest[ed] with the [L]egislature." *Id.*

**{30}** The year after *Martinez* was decided, our Legislature enacted NMSA 1978, Section 30-22-8.1 (1999), the focus of the parties' disagreement about *Fellhauer*'s second prong. That statute, titled "Escape from a community custody release program[,]" provides:

> Escape from a community custody release program consists of a person, excluding a person on probation or parole, who has been lawfully committed to *a judicially approved community custody release program*, including a day reporting program, an electronic monitoring program, a day detention program or a community tracking program, escaping or attempting to escape from the community custody release program.

Section 30-22-8.1(A) (emphasis added).[9]

**{31}** In *Duhon*, this Court considered the meaning of the words "judicially approved community custody release program" in determining that a defendant would have been subject to a charge of escape while she was on house arrest. 2005-NMCA-120, ¶¶ 11-13. The defendant there had been granted pretrial release pursuant to a court order requiring her to be on "strict house arrest"; "wear an ankle bracelet provided and monitored twenty-four . . . hours a day"; submit to random urinalysis by and check in daily with the adult probation office; and "travel . . . only to meet with her attorney, for medical emergencies, to church, and to mental health counseling[,]" and then only "while accompanied by her parents." *Id.* ¶ 3 (internal quotation marks omitted). The district court awarded her credit for only half the time she had spent on house arrest, *id.* ¶ 5, apparently because it believed that Section 30-22-8.1 applied only during time spent in a "formally adopted, county-wide, pre-existing uniform system of release."[10]

---

9In explaining the backdrop against which Section 30-22-8.1 was enacted, we in no way imply that the Legislature intended the statute to precisely plug the gap in the statutory scheme governing the various crimes of escape we identified in *Martinez*. The Legislature has no obligation to react to this Court's notions of the desirability of such gaps, let alone to ensure that legislation it enacts to address any gap there may be fits as neatly as the missing piece of a puzzle.

10*See generally* NMSA 1978, § 33-3-24 (1981) (enabling "[t]he sheriff of any county or the jail administrator of any jail with the approval of the board of county commissioners and the governing body of the municipality, as applicable," to "establish a prisoner-release program in accordance with [NMSA 1978, Sections 33-2-43 (1969) and 33-2-44 (1971)]").

*Duhon*, 2005-NMCA-120, ¶ 9. This Court reversed, reasoning that, because the defendant's "release to house arrest was a form of 'community custody release' that was 'judicially approved[,]' " the case turned on "whether that release was pursuant to a 'program[,]' " and held that it was. *Id.* ¶ 11. Applying the plain meaning rule in light of the dictionary definition of that word, the Court noted that "program" suggested only "that any release [would] be subject to defined procedures and conditions[.]" *Id.* In contrast, "[n]othing about the terminology in the statute suggest[ed] that . . . a formalized, universally applicable methodology [was] contemplated or required." *Id.* Thus, for instance, the statute generically referenced "electronic monitoring programs" without mentioning the formalized, county-approved programs the district court had cited in support of its ruling. *Id.* And, the Court reasoned, policy supported following the clear signals sent by the unadorned text because doing so served "[t]he societal interest in obtaining criminal defendants' compliance with custodial restrictions" while simultaneously giving district courts desirable flexibility. *Id.* ¶ 12. The Court consequently concluded that "the release of a criminal defendant may be 'judicially approved' "—and therefore within the scope of Section 30-22-8.1—"subject to defined procedures and conditions on a case-by-case basis." *Duhon*, 2005-NMCA-120, ¶ 11. Because the defendant could have been prosecuted for escape throughout her time on house arrest, she was entitled to full credit. *Id.* ¶ 13.

**{32}**     The State concedes that Defendant's confinement meets the second *Fellhauer* prong under our decision in *Duhon* because Defendant was in an "electronic monitoring program," which, Defendant reminds us, is "a form of release *enumerated* in Section 30-22-8.1[(A).]" While we are not bound by the State's concession, *State v. Comitz*, 2019-NMSC-011, ¶ 25, 443 P.3d 1130, we agree with it. *Duhon* held that a defendant satisfies the second prong of *Fellhauer* if the defendant is subject to a charge of escape under Section 30-22-8.1. A defendant is subject to a charge of escape under that statute if the defendant is "lawfully committed"[11] to a "judicially approved" "electronic monitoring program," as Defendant was here. The conditions of Defendant's release thus satisfy the second *Fellhauer* prong under *Duhon*.[12]

---

[11]*See generally State v. Alderette*, 1990-NMCA-132, ¶ 1, 111 N.M. 297, 804 P.2d 1116 (holding "that the escape from jail statute does not require commitment on a criminal charge" and overruling precedent to the contrary in light of the statute's evolution).

[12]Without reaching a conclusion under *Fellhauer*'s second prong, the dissent asserts that our holding renders "unclear[,]" Dissenting Op. ¶ 42 n.17, the distinction between amenability to escape charges and the ordinary potential for the revocation of pretrial release. We think this criticism is unwarranted. Our opinion says only that a defendant who is released into an electronic monitoring program administered by pretrial services personnel may be subject to a charge of escape if the defendant escapes from that program—i.e., that such electronic monitoring programs constitute "electronic monitoring program[s]" within the scope of Section 30-8-22.1. In our view—and, as noted, the State's—that holding is nothing more than a simple application of our previous decision in *Duhon*, where we held that a defendant who was released pursuant to an order requiring her to "wear an ankle bracelet provided and monitored twenty-four . . . hours a day" would have been subject to an escape charge. 2005-NMCA-120, ¶¶ 3, 10-13 (internal quotation marks omitted); *see also Woods*, 2010-NMCA-017, ¶ 20 ("The defendant [in *Duhon*] was subject to prosecution under [Section 30-22-8.1] because her release to house arrest constituted a judicially approved form of community custody release that was subject to defined procedures and conditions established by the court." (internal quotation marks and citation omitted)).

**{33}** Undeterred, the State contends that Defendant does not qualify for credit nonetheless, essentially arguing that we should overrule *Duhon* because, in reaching its holding in that case, this Court took insufficient account of "the identity of the custodian" in pretrial release programs not administered by correctional institutions and thus went "against the . . . direction" pointed to by our previous holdings in *Fellhauer* and *Guillen*. *But cf. Guillen*, 2001-NMCA-079, ¶¶ 8-9 (holding that conditions requiring the defendant to " 'remain at his home at all times except to attend alcohol counseling, work, or religious services' " and to submit to electronic monitoring "by correctional officers" sufficiently restricted the defendant's movement to satisfy the *first* prong of *Fellhauer*). We are not persuaded that we should depart from the doctrine of stare decisis—our duty to follow precedent—"a foundation stone of the rule of law," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014), that "lies at the very core of the judicial process." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 15, 134 N.M. 43, 73 P.3d 181 (citation omitted).

**{34}** The State has not persuaded us that *Duhon* was mistakenly decided. We perceive no flaw in *Duhon*'s reasoning and, to the extent our holding in that case can even be said to be inconsistent with what might be characterized as mixed signals in *Fellhauer*,[13] that inconsistency can readily be explained by the fact that the issue before this Court in *Duhon* involved the interplay between the statute we interpreted in *Fellhauer* and a statute that did not exist when that case was decided. *Duhon* was the first case in which this Court addressed the impact of the then-recently-enacted community custody release program escape statute on the second prong of the *Fellhauer* test. *Fellhauer* stands for the proposition that conditions of release satisfy the second prong if a defendant could be subject to an escape charge for particular conduct that would be inconsistent with an order of release. And Section 30-22-8.1 does not limit the kinds of "electronic monitoring program[s]" that can be the basis of an escape charge it makes it a crime to escape from. Our holding in *Duhon* flowed directly from the confluence of these two principles. And, although Section 30-22-8.1 changed the statutory scheme governing crimes of escape without directly addressing presentence confinement credit, there is every reason to think that the Legislature intended the statute to address both subjects. We presume the Legislature "to know existing law and judicial pronouncements[,]" *Alderette*, 1990-NMCA-132, ¶ 8, and "underst[and] the full impact of its legislation." *First Fin. Tr. Co. v. Scott*, 1996-NMSC-065, ¶ 18, 122 N.M. 572, 929 P.2d 263. Since *Fellhauer* had already established a defendant's amenability to an escape charge as one prong of the test under the presentence confinement credit statute, it was entirely reasonable for the *Duhon* Court to conclude that Section 30-22-8.1 broadened the circumstances under which a defendant would qualify for credit

---

13*Compare Fellhauer*, 1997-NMCA-064, ¶ 17 (holding that a defendant satisfies the second prong if "non-compliance" with an order of release could lead to a conviction for a crime of escape), *with id.* ¶ 16 (indicating that "[t]he identity of the custodian is a common sense marker" of official confinement that "recommends itself" as part of the inquiry).

under Section 31-20-12. Because we are not aware of any basis for overruling *Duhon*, we decline to do so.[14]

**CONCLUSION**

**{35}** We affirm Defendant's convictions, reverse his sentence, and remand with instructions to credit Defendant for the time he spent on pretrial release.

**{36} IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**I CONCUR:**

**JENNIFER L. ATTREP, Judge**

**BRIANA H. ZAMORA, Judge (dissenting, in part).**

**B. ZAMORA, Judge (dissenting, in part).**

**{37}** I respectfully dissent from the majority's conclusion that Defendant was entitled to presentence confinement credit. In my view, the district court properly denied Defendant's request for credit because the record demonstrates that Defendant's freedom of movement was not "sufficiently onerous to be deemed official confinement" and I would affirm the district court's ruling. *Fellhauer*, 1997-NMCA-064, ¶ 8.

**{38}** Only a defendant who is "held in *official confinement*" is entitled to presentence confinement credit. Section 31-20-12 (emphasis added).[15] In *Fellhauer*, we clarified that

---

14Even if the State had persuaded us that *Duhon* was incorrectly decided, we would not have a basis for overruling it. Absent an obvious error in a prior decision, our appellate courts demand "special justification [before they will] depart from precedent." *Herrera*, 2003-NMSC-018, ¶ 15. *See generally State v. Radosevich*, 2018-NMSC-028, ¶ 21, 419 P.3d 176 ("We do not overturn precedent lightly, but where our analysis convincingly demonstrates that a past decision is wrong, the Court has not hesitated to overrule even recent precedent." (internal quotation marks and citation omitted)); *Territory ex rel. Klock v. Mann*, 1911-NMSC-027, ¶ 1, 16 N.M. 211, 114 P. 362 (stating that one justification for overruling precedent may exist where the precedent is "palpably contrary to reason and right"). A party asking this Court to overrule one of our prior decisions must ordinarily demonstrate that (1) the decision "is so unworkable as to be intolerable"; (2) reversing the decision would not "create an undue hardship" as a result of justifiable reliance on our earlier, erroneous pronouncement of the law; (3) the law surrounding the prior decision has "developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine"; or (4) "the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification." *Herrera*, 2003-NMSC-018, ¶ 15 (internal quotation marks and citation omitted). The State has not addressed any of these factors.

15"[L]awful custody or confinement" is defined as "*the holding of any person pursuant to lawful authority*, including, without limitation, actual or constructive custody of prisoners temporarily outside a . . . jail[.]" NMSA 1978, § 30-1-12(H) (1963) (emphasis added); *see Fellhauer*, 1997-NMCA-064 ¶ 6 (stating "[t]he terms used in [Section 31-20-12 and Section 30-1-12(H)] are not identical, but it is reasonable to treat 'lawful custody or confinement' and 'official confinement' as closely related, if not functionally equivalent, concepts").

"actual incarceration in a jail facility is not an absolute prerequisite to a finding that a person has been in official confinement under Section 31-20-12," *Fellhauer*, 1997-NMCA-064, ¶ 7, however, we also clarified that a defendant whose presentence period is not spent at a jail or other correctional facility is only entitled to presentence confinement credit if the conditions of release are "sufficiently onerous to be deemed official confinement." *Id.* ¶ 8.

**{39}** In my view, the majority ignores the record that clearly demonstrates Defendant's conditions of release were not onerous. As we noted in *Fellhauer*, fact- finding by sentencing courts may be required in determining whether a defendant's conditions of release are sufficiently onerous such that the defendant is entitled to credit. *See* 1997-NMCA-064, ¶ 16 (stating that "our cases have demonstrated some willingness to engage in fact[-]finding in [determining presentence confinement credit and w]e are not inclined to foreclose the exercise of reasonable flexibility by sentencing courts through the adoption of too bright a line"). Because our sentencing courts are intimately familiar with the pretrial services programs in their respective jurisdiction and consequently, with a defendant's particular conditions of release, common sense dictates that to the extent such factual findings are necessary, the responsibility of said findings should rest with the sentencing courts. *See State v. Juan*, 2010-NMSC-041, ¶ 33, 148 N.M. 747, 242 P.3d 314 (stating "[w]ith respect to the factual review, we do not sit as a trier of fact, recognizing that the trial court has the best vantage from which to resolve questions of fact" (internal quotation marks and citation omitted)). In this case, the majority eschews the statements of pretrial services and relies exclusively on the written order setting conditions of release in coming to its determination that Defendant was entitled to credit. This approach inappropriately elevates the text of the written order over Defendant's actual conditions of release.

**{40}** The majority writes, "[a]t no point while [Defendant] was released pending trial or sentencing did Defendant have the freedom to choose his own whereabouts." Maj. Op. ¶ 22. The undisputed record points to the contrary. Nowhere in Defendant's original conditions of release order did it specify that Defendant was on house arrest or was restricted from leaving his home at certain times and only permitted to attend specified places. In addition, Marshall Dixon, the pretrial services officer supervising Defendant, explicitly stated that he was not supervising Defendant on house arrest because the order setting conditions of release did not require house arrest. Dixon stated that he approved any "movement[s]" requested by Defendant, including permitting Defendant to go to an Isotopes baseball game, so long as he was accompanied by an approved third party. According to Dixon, there is nothing contained within the order setting conditions of release that would "allow [him] to disallow movement." Thus, Defendant had no curfew, nor did Dixon restrict Defendant from leaving his home. Finally, Dixon explained that neither he nor pretrial services was tracking all of Defendant's movements (like a correctional community custody program), because pretrial services does not "have the staff capable to follow every person ordered to electronic monitoring."[16]

---

16After learning that Defendant was free to attend any and all recreational activities he requested (i.e. movies, swimming or baseball games), the district court entered an amended order setting conditions of

**{41}** Defendant's conditions of release are far more permissive than conditions we have previously held were sufficiently onerous to support presence confinement credit. In *Duhon*, the defendant was released on conditions of "strict house arrest" requiring her to (1) "wear an ankle bracelet provided and monitored twenty-four . . . hours a day" (2) "submit to random urinalysis by the adult probation office" (3) have daily appointments with the probation office; and (4) she was only permitted to leave her home "while accompanied by her parents [and] only to meet with her attorney, for medical emergencies, to church, and to mental health counseling." 2005-NMCA-120, ¶ 3. Similarly, in *Guillen*, the defendant's terms of release required him to remain at home except to attend treatment, work, or school. 2001-NMCA-079, ¶ 11. Here, unlike *Duhon* and *Guillen*, Defendant was not placed on house arrest, was not subject to a curfew, and the restrictions on his freedom of movement were not sufficiently onerous to support a finding that Defendant was held in official confinement under Section 31-20-12. *See Guillen*, 2001-NMCA-079, ¶ 9 (stating "a curfew, without more, is an insufficient restriction on movement to entitle a defendant to presence credit"); *see id.* (stating "house arrest is substantially more onerous than a curfew").

**{42}** In sum, throughout the pendency of the case, Defendant was free to leave without restriction (1) with approval of pretrial services, and (2) if he was accompanied by an approved third party. In my view, these two conditions of release were not sufficiently restrictive of Defendant's freedom of movement as required by *Fellhauer* and *Duhon* to support the majority's holding that Defendant was entitled to presence confinement credit. Because I would conclude that the first prong of the *Fellhauer* test was not satisfied, I would not analyze whether Defendant was subject to potential punishment for a crime of escape.[17]

**{43}** For the foregoing reasons, I respectfully dissent and would affirm the district court's order denying Defendant's request for presence confinement credit.

---

release briefly restricting Defendant from attending recreational activities. However, later that same day, after reviewing the recording of the detention hearing (the detention hearing was held by a different judge), the district court removed the restriction on recreational activities and reinstated the original, more permissive conditions of release.

17I note that in analyzing the second *Fellhauer* prong, the crucial inquiry is whether a defendant is in "official confinement" and consequently, subject to prosecution for escape or if a defendant is not confined and only subject to a violation of conditions of release. 1997-NMCA-064, ¶¶ 16-20. Under the majority's analysis, this distinction is unclear. "In writing and construing the criminal law, both our state [L]egislature and [the appellate courts] owe [individuals] a duty of clarity. We cannot ask our citizens to guess at the meaning of a criminal statute." *State v. Chavez*, 2009-NMSC-035, ¶ 18, 146 N.M. 434, 211 P.3d 891 (omission, internal quotation marks, and citation omitted). "To satisfy the constitutional requirements of due process, a criminal statute must, with sufficient certainty, alert a person of ordinary intelligence that his conduct is prohibited." *Id.*; *see also State v. Ogden*, 1994-NMSC-029, ¶ 25, 118 N.M. 234, 880 P.2d 845 (stating that we strictly construe "[s]tatutes defining criminal conduct . . . and doubts about construction of criminal statutes are resolved in favor of lenity"). Interpreting our escape statute broadly will necessarily lead to less uniformity in application of Section 31-20-12 and will provide the public (and the defendants who may or may not be in official confinement) with little notice as to what constitutes escape from a community custody release program.

**BRIANA H. ZAMORA, Judge**